## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| RS LEGACY CORPORATION, *et al.*, | : |
| | : Case No. 15-10197 (BLS) |
| Debtors.[1] | : |
| | : (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Salus Capital Partners, LLC, in its capacity as Agent, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| Standard Wireless Inc.; General Wireless Inc.; Standard | : Adv. Proc. No. 15-50239 |
| General L.P.; General Retail Holdings L.P.; General | : |
| Retail Funding LLC; Litespeed Master Fund, Ltd.; | : |
| Litespeed Management, L.L.C.; Cantor Fitzgerald | : |
| Securities LLC; BlueCrest Multi Strategy Credit Master | : ***NOTICE OF APPEAL*** |
| Fund Limited; DW Catalyst Master Fund, Ltd.; DW | : |
| Value Master Fund, Ltd.; Saba Capital Management, LP; | : **Re: Docket Nos. 67, 68** |
| Macquarie Credit Nexus Master Fund Limited; Taconic | : |
| Opportunity Master Fund L.P.; Taconic Master Fund 1.5 | : |
| L.P.; T. Rowe Price Associates, Inc.; Mudrick Capital | : |
| Management, LP.; and John Does #1-50, | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's taxpayer identification number, are RS Legacy Corporation (f/k/a/ RadioShack Corporation) (7710); Atlantic Retail Ventures, Inc. (6816); Ignition L.P. (3231); ITC Services, Inc. (1930); Merchandising Support Services, Inc. (4887); RS Legacy Customer Service LLC (f/k/a RadioShack Customer Service LLC) (8866); RS Legacy Global Sourcing Corporation (f/k/a RadioShack Global Sourcing Corporation) (0233); RS Legacy Global Sourcing Limited Partnership (f/k/a RadioShack Global Sourcing Limited Partnership) (8723); RS Legacy Global Sourcing, Inc. (f/k/a RadioShack Global Sourcing, Inc.) (3960); RS Ig Holdings Incorporated (8924); RSIgnite, LLC (0543); SCK, INc. (9220); RS Legacy Finance Corporation (f/k/a Tandy Finance Corporation) (5470); RS Legacy Holdings, Inc. (f/k/a Tandy Holdings Inc.) (1789); RS Legacy International Corporation (f/k/a Tandy International Corporation) (9940); TE Electronics LP (9965); Trade and Save LLC (3850); and TRS Quality, Inc. (5417).  The address of each of the Debtors is 300 RadioShack Circle, Fort Worth, Texas 76102.

## NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that Salus Capital Partners, LLC, in its capacity as Agent, hereby appeals pursuant to 28 U.S.C. § 158(a) and Rule 8003 of the Federal Rules of Bankruptcy Procedure each of the following opinions and orders entered in the above captioned adversary proceeding in the above captioned chapter 11 cases by the Honorable Brendan L. Shannon, United States Bankruptcy Judge of the United States Bankruptcy Court for the District of Delaware:

> Opinion and Order Regarding Motions to Dismiss entered on May 11, 2016 (Adversary Docket No. 67 and 68) (collectively the "Order")

A copy of the Order is attached hereto as Exhibit 1.

The names of all parties to the Orders appealed from and the names, addresses, and telephone numbers of their respective attorneys are as follows:

| COUNSEL FOR SALUS CAPITAL PARTNERS, LLC (APPELLANT): | COUNSEL FOR BLUECREST MULTI STRATEGY CREDIT MASTER FUND LIMITED; DW CATALYST MASTER FUND LTD.; DW VALUE MASTER FUND, LTD.; SABA CAPITAL MANAGEMENT, L.P.; MACQUARIE CREDIT NEXUS MASTER FUND LIMITED; TACONIC OPPORTUNITY MASTER FUND L.P.; TACONIC MASTER FUND 1.5 L.P.; T. ROWE PRICE ASSOCIATES, INC.; AND MUDRICK CAPITAL MANAGEMENT, LP: |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>Anthony W. Clark<br>Jason M. Liberi<br>One Rodney Square<br>P.O. Box 636<br>Wilmington, Delaware 19899-0636<br>Telephone:  (302) 651-3000<br><br>- and -<br><br>Jay M. Goffman<br>Mark A. McDermott<br>Christine A. Okike<br>Four Times Square<br>New York, New York 10036<br>Telephone: (212) 735-3000 | DAVIS POLK & WARDWELL LLP<br>Damian S. Schaible<br>Elliot Moskowitz<br>Michael J. Russano<br>Darren S. Klein<br>450 Lexington Avenue<br>New York, NY 10017<br>Telephone:  (212) 450-4000<br><br><br><br>- and - |

|  |  |
|---|---|
|  | BLANK ROME LLP<br>Stanley B. Tarr<br>Victoria Guilfoyle<br>1201 N. Market Street, Suite 800<br>Wilmington, DE 19801<br>Telephone: (302) 425-6400<br>Facsimile: (302) 425-6464<br><br>- and -<br><br>Lawrence F. Flick II<br>Rick Antonoff<br>Michael Kim<br>The Chrysler Building<br>405 Lexington Avenue<br>New York, NY 10174-0208<br>Telephone: (212) 885-5000 |
| COUNSEL FOR GENERAL WIRELESS INC.;<br>STANDARD GENERAL L.P.; GENERAL RETAIL<br>HOLDINGS L.P.; AND GENERAL RETAIL<br>FUNDING LLC:<br><br>DLA PIPER LLP (US)<br>Kevin D. Finger<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Telephone: (212) 335-4500<br><br>- and -<br><br>ROPES & GRAY LLP<br>Gregg M. Galardi<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Telephone: (212) 596-9000<br><br>- and -<br><br>DEBEVOISE & PLIMPTON LLP<br>Richard F. Hahn<br>M. Natasha Labovitz<br>Shannon R. Selden<br>Nick S. Kaluk, III<br>919 Third Avenue<br>New York, NY 10022<br>Telephone: (212) 335-4500 | COUNSEL FOR CANTOR FITZGERALD<br>SECURITIES LLC:<br><br>NORTON ROSE FULBRIGHT US LLP<br>H. Stephen Castro<br>Steve Dollar<br>666 Fifth Avenue<br>New York, NY 10103-3198<br>Telephone: (212) 318-3147<br>Facsimile: (212) 318-3400<br><br>- and -<br><br>POTTER ANDERSON & CORROON LLP<br>Jeremy W. Ryan<br>R. Stephen McNeill<br>1313 North Market Street, Sixth Floor<br>P.O. Box 951<br>Wilmington, DE 19899-0951<br>Telephone: (302) 984-6000 |

| COUNSEL FOR THE LIQUIDATING TRUSTEE (INTERESTED PARTY): | COUNSEL FOR LITESPEED MASTER FUND LTD AND LITESPEED MANAGEMENT L.L.C.: |
|---|---|
| COOLEY LLP<br>Jay R. Indyke<br>Cathy Hershcopf<br>1114 Avenue of the Americas<br>New York, NY 10036<br>Telephone:  (212) 479-6000<br><br>- and -<br><br>WHITEFORD, TAYLOR & PRESTON LLC<br>Christopher M. Samis<br>L. Katherine Good<br>Chantelle D. McClamb<br>The Renaissance Centre, Suite 500<br>405 N. King Street<br>Wilmington, DE 19801<br>Telephone:  (302) 353-4144 | GOODWIN PROCTER LLP<br>Michael B. Goldstein<br>Gregory W. Fox<br>Brian D. Hail<br>The New York Times Building<br>620 Eighth Avenue<br>New York, NY 10018<br>Telephone:  (212) 813-8800<br><br>- and -<br><br>YOUNG, CONAWAY, STARGATT & TAYLOR LLP<br>C. Barr Flinn<br>Kenneth J. Enos<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE  19801<br>Telephone:  (302) 571-6600 |
| OFFICE OF THE UNITED STATES TRUSTEE (INTERESTED PARTY):<br><br>Office of the United States Trustee<br>Richard L. Schepacarter, Trial Attorney<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801<br>Telephone:  (302) 573-6491 | |

Dated:  Wilmington, Delaware
        May 24, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Anthony W. Clark*
Anthony W. Clark (I.D. No. 2051)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone:  (302) 651-3000

- and -

Jay M. Goffman
Mark A. McDermott
Christine A. Okike
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000

*Counsel for Plaintiff Salus Capital Partners, LLC, as agent, with respect to claims against Defendants Cantor Fitzgerald Securities LLC, BlueCrest Multi Strategy Credit Master Fund Limited, DW Catalyst Master Fund, Ltd., DW Value Master Fund, Ltd.; Saba Capital Management, LP, Macquarie Credit Nexus Master Fund Limited, Taconic Opportunity Master Fund L.P., Taconic Master Fund 1.5 L.P., Mudrick Capital Management, LP., and John Does #1-50*

- and -

CHOATE, HALL & STEWART LLP
John F. Ventola
Douglas R. Gooding
Sean M. Monahan
Two International Place
Boston, Massachusetts 02110
Telephone: (617) 248-5000

*Counsel for Plaintiff Salus Capital Partners, LLC, as agent, with respect to claims against Defendants Standard Wireless Inc., General Wireless Inc., Standard General L.P., General Retail Holdings L.P., General Retail Funding LLC, Litespeed Master Fund, Ltd., Litespeed Management, L.L.C., and T. Rowe Price Associates, Inc.*

## EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**RADIOSHACK CORPORATION, et al.,**[1]<br><br>   Debtors. | Chapter 11<br><br>Case No. 15-10197 (BLS)<br><br>Jointly Administered |
| Salus Capital Partners, LLC, in its capacity as Agent,<br><br>   Plaintiff,<br><br>v.<br><br>Standard Wireless Inc.; General Wireless Inc.; Standard General L.P.; General Retail Holdings L.P.; General Retail Funding LLC; Litespeed Master Fund, Ltd.; Litespeed Management, L.L.C.; Cantor Fitzgerald Securities LLC; Bluecrest Multi Strategy Credit Master Fund Limited; DW Catalyst Master Fund, Ltd.; DW Value Master Fund, Ltd.; Saba Capital Management, LL; Macquarie Credit Nexus Master Fund Limited; Taconic Opportunity Master Fund L.P.; Taconic Master Fund 1.5 L.P.; T. Rowe Price Associates, Inc.; Mudrick Capital Management, LP.; And Jon Does #1-50,<br><br>   Defendants. | Adv. No. 15-50239 (BLS)<br><br>Re: Dkt. Nos. 32, 38, 39, 40, 41, 43, 44, 53, 57, 58, 59, 60 and 62 |

---

[1] The Debtors include the following entities:  RadioShack Corporation; Atlantic Retail Ventures, Inc.; Ignition L.P.; ITC Services, Inc.; Merchandising Support Services, Inc.; RadioShack Customer Service LLC; RadioShack Global Sourcing Corporation; RadioShack Global Sourcing Limited Partnership; RadioShack Global Sourcing, Inc.; RS Ig Holdings Incorporated; RSIgnite, LLC; SCK, Inc.; Tandy Finance Corporation; Tandy Holdings, Inc.; Tandy International Corporation; TE Electronics LP; Trade and Save LLC; and TRS Quality, Inc.

# MEMORANDUM OPINION[2]

## I. INTRODUCTION

On December 10, 2013—roughly 14 months before the commencement of its Chapter 11 case—RadioShack entered into a new $835 million financing arrangement with two distinct sets of lenders. While the precise terms of that financing are predictably complex and voluminous (and are discussed in detail below), they may be described in summary as (i) a $250 million term loan from the SCP Lenders[3] and (ii) a $585 million facility from the Original ABL Lenders, consisting of a $50 million term loan and $535 million in revolving loan commitments.  All of these obligations were secured by substantially all of RadioShack's assets.  The Intercreditor Agreement provided that the Original ABL Lenders held a first lien on Liquid Collateral and a second lien on Fixed Assets.  The SCP Lenders, in turn, enjoyed a first lien on Fixed Assets and a second lien on Liquid Collateral.  In early October 2014, Cantor Fitzgerald succeeded as agent of the ABL Facility, new parties acquired the positions of the Original ABL Lenders, and the Original ABL Credit Agreement was restructured.

---

[2] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . ."  Fed. R. Bankr. P. 7052(a)(3).  Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[3] Capitalized terms used in this Introduction shall have the meanings assigned to such terms infra.

During the Chapter 11 case, a portion of RadioShack's business was sold as a going concern and the balance was shut down and liquidated. Proceeds from the sale and liquidation were distributed in accordance with the provisions and the priorities established in the Intercreditor Agreement. The ABL Lenders received over $232 million on account of the disposition of the Liquid Collateral in which they claim a first lien position.

The litigation presently before the Court rests on a threshold proposition: that the 2014 restructuring of the Original ABL Credit Agreement resulted in those loan obligations losing first lien rights under the Intercreditor Agreement. If that is the case, then Salus contends that the ABL Lenders have lost or at least reduced their first lien rights in the Liquid Collateral, and that the proceeds from the disposition of the Liquid Collateral that were paid to the ABL Lenders must be paid over to them.

As set forth in detail below, the Court concludes that the restructuring of the Original ABL Credit Agreement in October 2014 was permissible under the Intercreditor Agreement, and therefore the ABL Lenders' first lien rights in the Liquid Collateral were not waived or otherwise impaired. More specifically, the record reflects that the SCP Lenders' consent was not contractually required for the October

3

2014 restructuring, and their economic position was not impermissibly changed thereby: the SCP Lenders held junior liens on the Liquid Collateral, which were behind $585 million of first-priority liens, both before and after the October 2014 restructuring.

Each of the nine causes of action set forth in the Amended Complaint is predicated exclusively on the proposition that the October 2014 restructuring vitiated or materially limited the ABL Lenders' rights to be paid first from the proceeds of the Liquid Collateral. Because the Court concludes that the October 2014 restructuring did not have this effect, the Amended Complaint will be dismissed with prejudice.

## II.  BACKGROUND

RadioShack has been a significant part of the American retail landscape for over 90 years.  Shortly before its bankruptcy filing, RadioShack had more than 21,000 employees, 4,400 company-operated stores across the United States, Mexico and Asia, and more than 1,100 franchise stores worldwide.  After years of declining revenues, however, and facing a liquidity crisis, RadioShack filed for relief under chapter 11 of the Bankruptcy Code on February 5, 2015.  Following a contested sale and a subsequent plan confirmation process, the Debtors' First Amended Joint Plan of Liquidation (the "Plan") was

confirmed on October 2, 2015.  On October 8, 2015, the Plan went effective.

<u>Pre-Petition Capital Structure</u>

On December 10, 2013, Salus Capital Partners, LLC ("Salus"), Salus CLO 2012-1, Ltd., Cerberus Levered Loan Opportunities Fund II, LP, Cerberus NJ Credit Opportunities Fund, L.P. and Cerberus ASRS Holdings LLC (collectively, the "SCP Lenders") entered into a lending agreement with RadioShack, agreeing to provide a $250 million term loan (the "SCP Term Loan").  <u>See</u> Am. Compl. ¶¶ 23-24.  The SCP Term Loan was secured by (i) a first priority lien on RadioShack's fixed assets, intellectual property and equity interests of RadioShack subsidiaries (collectively, the "Fixed Assets") and (ii) a second priority lien on certain other assets of RadioShack — principally accounts receivable and inventory (the "Liquid Collateral").  <u>See</u> Am. Compl. at ¶¶ 23-24; Moskowitz Decl. at Ex. A; Intercreditor Agreement §1.2.[4]

---

[4] In deciding a motion to dismiss, a court may consider the allegations of the complaint, exhibits attached thereto, and items integral to or explicitly relied upon in the complaint.  <u>See, e.g.</u>, <u>Ali v. Amoroso</u>, 514 F. App'x 108, 111-12 (3d Cir. 2013); <u>In re Rockefeller Center Properties, Inc. Securities Litig.</u>, 184 F.3d 280, 287 (3d Cir.1999) (ruling that on a motion to dismiss court may consider certain material, including items integral to or explicitly relied upon in the complaint); <u>Pension Benefit Guar. Corp. v. White Consol. Indus.</u>, Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that courts may consider undisputedly authentic documents attached as exhibits to a motion to dismiss if the plaintiff's claims are based on the documents).  Here, the claims set forth in the Amended Complaint derive from the Intercreditor Agreement (the "Intercreditor Agreement") and the relevant loan documents.  Additionally, there is no question as to their authenticity.  Thus, the Court will consider these documents when deciding these Motions to Dismiss.

Also on December 10, 2013, a group of lenders (the "Original ABL Lenders") led by General Electric Capital Corp. entered into an agreement to provide a $535 million revolving asset-based credit facility and a $50 million asset-backed term loan[5] (collectively, the "Original ABL Credit Agreement") to RadioShack.  See Am. Compl. at ¶¶27-28; Moskowitz Decl. Ex. B.  The Original ABL Credit Agreement was secured by (i) a first priority lien on the Liquid Collateral and (ii) a second priority lien on the Fixed Assets.  See Am. Compl. at ¶ 29.

In connection with the SCP Term Loan and the Original ABL Credit Agreement, Salus (as agent for the SCP Lenders) and the Original ABL Agent entered into the Intercreditor Agreement on December 10, 2013.  See Am. Compl. at ¶ 30.  The Intercreditor Agreement, discussed in more detail below, governed the relative rights and priorities of the SCP Lenders and the Original ABL Lenders with respect to the collateral securing each facility.  See Am. Compl. at ¶ 30.

The October 2014 Transactions

On October 3, 2014, the Original ABL Lenders sold all of their interests under the Original ABL Credit Agreement to General Retail

---

[5] According to Salus's Amended Complaint, the $50 million term loan "is a senior lien claim not addressed or disputed by [the] Amended Complaint" and it is not relevant to its claims.  See Am. Compl. ¶ 44, n. 5.

Holdings L.P. ("GRH") and General Retail Funding LLC ("GRF").  See Am. Compl. at ¶ 34.  GRH and GRF are affiliates of Standard General. See Am. Compl. at ¶ 34.  GE Capital assigned its administrative and collateral agent role to Cantor Fitzgerald Securities LLC ("Cantor Fitzgerald").  See Am. Compl. at ¶ 35.  Shortly thereafter, funds affiliated with BlueCrest Capital Management (New York) LP, DW Partners, L.P., Macquarie Credit Investment Management Inc., Mudrick Capital Management, LP, Saba Capital Management, L.P., T. Rowe Price Associates, Inc. and Taconic Capital Advisors LP (collectively, the "First Out Lenders") acquired participating interests in the Original ABL Credit Agreement (the First Out Lenders, together with GRH and GRF, are collectively referred to hereinafter as the "ABL Lenders").[6] See Am. Compl. at ¶ 35.

---

[6] The parties throughout their pleadings have used different terms to define the parties involved in the October 2014 transactions.  The Amended Complaint refers to the "Hedge Fund Lenders."  See Am. Compl. at ¶ 3 (defining "Hedge Fund Lenders" as "certain of the defendants and/or their affiliates"); Answering Brief at 27 n. 25 (clarifying that the "Hedge Fund Lenders" include all named defendants other than the ABL Agent . . . .).  However, each of the moving parties does not.  See Memorandum of Law in Opposition at 1 n. 1 (defining "ABL Lenders" and "First Out Lenders" and also explaining that Standard General L.P., Litespeed Master Fund, Ltd. And Litespeed Management LLC may have improperly been named as defendants); Memorandum of Law in Opposition at 10 n. 7 ("Salus may be referring to the ABL Lenders as the 'Hedge Fund Lenders' . . . .").  For the purposes of this opinion, the Court will use the term "ABL Lenders" to refer to all named defendants except Litespeed Master Fund, Ltd. ("LSMF"), Litespeed Management LLC ("LSM") and Cantor Fitzgerald.  LSMF and LSM will collectively be referred to as Litespeed. Cantor Fitzgerald will be referred to individually.

That same day, RadioShack executed an amendment to the Original ABL Credit Agreement (the "Amended ABL Credit Agreement") with the ABL Lenders and Cantor Fitzgerald. See Am. Compl. at ¶¶ 35-36. The Amended ABL Credit Agreement provided for the refinancing of $535 million of the Original ABL Credit Agreement into (i) a credit facility in an aggregate principal amount of $275 million (the "Term Out Revolving Loan"), (ii) a letter of credit facility in an aggregate principal amount of $120 million (the "LOC Facility") and (iii) a revolving credit facility in an aggregate principal amount of up to $140 million (the "Effective Date Revolving Commitments"). See Am. Compl. at ¶ 36.

The Loan Documents and Intercreditor Agreement

The Intercreditor Agreement and the Amended ABL Credit Agreement each provide that they shall be interpreted under, and that the rights and liabilities of the parties are determined in accordance with, the laws of the State of New York. See Am. Compl. at ¶ 14; ABL Opp. at 10; CF Opp. at 6.[7] The Intercreditor Agreement provides that the proceeds of the Liquid Collateral shall be applied *first* to the

---

[7] "ABL Opp." refers to the Memorandum of Law in Support of Motion of the ABL Lenders to Dismiss the Amended Adversary Complaint of Salus Capital Partners, LLC at Adv. D.I. 40. "CF Opp." refers to the Memorandum of Law In Support of the Motion of Cantor Fitzgerald Securities LLC, as ABL Agent, to Dismiss the Amended Adversary Complaint of Salus Capital Partners, LLC for Failure to State a Claim Pursuant to Federal Rule of Civil Procedure 12(b)(6) as Incorporated by Federal Rule of Bankruptcy Procedure 7012 at Adv. D.I. 44.

payment of the "Senior ABL Claims," *second* to the payment of the
"Senior SCP Claims," *third* to the payment of any "Excluded ABL
Claims," and *fourth* to the payment of any "Excluded SCP Claims".  See
Intercreditor Agreement § 4.1.

It is undisputed that the SCP Lenders hold "Senior SCP Claims."
What is in dispute is whether certain payments to the ABL Lenders
were made in satisfaction of "Senior ABL Claims" or "Excluded ABL
Claims."  The Intercreditor Agreement defines:

- "Senior ABL Claims" as all "ABL Claims other than Excluded
  ABL Claims";
- "ABL Claims" broadly as "any and all liabilities and
  indebtedness, however evidenced, of every kind, nature and
  description owing by any Credit Party to the ABL Agent and any
  of the [ABL Lenders]" arising from the ABL Lenders' loans to
  RadioShack; and
- "Excluded ABL Claims" as "the aggregate outstanding principal
  amount of loans and outstanding amount of Letters of Credit
  made, issued or incurred pursuant to the ABL Loan Documents
  in excess of the Maximum ABL Facility Amount at the time of
  such making, issuance or incurrence . . . ."

Intercreditor Agreement at §1.2.  Thus, the ABL Lenders were granted
liens that are senior to the liens of the SCP Lenders on all Liquid
Collateral for the aggregate principal amount of the ABL Lenders' loans
up to the "Maximum ABL Facility Amount."  The Intercreditor
Agreement defines "Maximum ABL Facility Amount" as "the
Aggregate Revolving Loan Commitments minus any permanent

reductions in the Revolving Loan Commitments." The Original ABL Credit Agreement defines:

- "Aggregate Revolving Loan Commitments" as "the combined Revolving Loan Commitments of the [ABL] Lenders, which shall initially be in the amount of $535,000,000, as such amount may be reduced from time to time pursuant to this Agreement"; and
- "Revolving Loan Commitments" is defined broadly to include any "amount set forth opposite such Lender's name in Schedule 1.1(b) under the heading "Revolving Loan Commitments" (such amount as the same may be reduced or increased from time to time in accordance with this Agreement. . .)"

See Original ABL Credit Agreement at §§ 1.1, 11.1.

Piecing this together, the ABL Lenders were granted liens that are senior to the liens of the SCP Lenders on all Liquid Collateral for the aggregate principal amount of the ABL Lenders' loans up to "the combined [amount set forth opposite such Lender's name in Schedule 1.1(b) under the heading 'Revolving Loan Commitments'], which shall initially be in the amount of $535,000,000, as such amount may be reduced from time to time pursuant to this Agreement," minus any permanent reduction to these Revolving Loan Commitments.

*Salus's Position*

The Amended Complaint posits that the Amended ABL Credit Agreement reduced the amount that the ABL Lenders could receive from the proceeds of the Liquid Collateral before the SCP Lenders. The Amended ABL Credit Agreement permanently reduced the

10

Revolving Loan Commitments, and as a result, the Amended ABL Credit Agreement reclassified portions of the ABL Lenders loans from first priority Senior ABL Claims (that the Original ABL lenders would have received under the Original ABL Credit Agreement) to third priority Excluded ABL Claims. Thus, Salus contends that payments made to satisfy third priority Excluded ABL Claims before the SCP Lenders' second priority Senior SCP Claims were made in violation of the Intercreditor Agreement. The Complaint argues that there were two separate "permanent reductions" to the Revolving Loan Commitments.

i) Revolving Loans Refinanced To Term Loans

Through the Amended ABL Credit Agreement, the ABL Lenders refinanced $275 million of revolving loans into the Term Out Revolving Loan. See Am. Compl. ¶ 36. As noted above, the Intercreditor Agreement defines "Maximum ABL Facility Amount," in relevant part, as the "Aggregate Revolving Loan Commitments minus any permanent reductions of the Revolving Loan Commitments." Intercreditor Agreement at § 1.2.

The fundamental difference between a revolving loan and a term loan is that revolving loans can be repaid and re-borrowed up to a commitment amount, whereas term loans may not be re-borrowed once

11

repaid.  Once a term loan is made, the "commitment" to make the loan ends, since the lenders are no longer obligated to advance any further funds in respect of such commitment.  Thus, Salus contends that the "Aggregate Revolving Loan Commitments" were permanently reduced by $275 million when $275 million of revolving loans were refinanced into the Term Out Revolving Loans.

ii) Illusory Commitments

Salus separately argues that the Maximum ABL Facility was further reduced by the amount of the Effective Date Revolving Commitment in the Amended ABL Credit Agreement because that "commitment" was purely illusory and neither capable of being, nor expected or intended to be, drawn.  <u>See</u> Am. Compl. ¶¶ 3, 36(iii), 40, 43, 53.  The Effective Date Revolving Commitment to RadioShack was $140 million.  <u>See</u> Am. Compl. ¶¶ 3, 36, 40.  However, given RadioShack's financial condition at that time, as well as the decreasing value of its borrowing base, Salus contends that the ABL Lenders and RadioShack knew that this "commitment" had no substance, and that the loan would never be available to RadioShack.  <u>See</u> Am. Compl. ¶¶ 32-40.  This "commitment" was in name only and, therefore, was effectively the same as terminating $140 million of commitments under the Original ABL Credit Agreement.  Salus contends that this

12

permanently reduced the Revolving Loan Commitments by $140 million, which further reduced the Maximum ABL Facility amount by a corresponding sum.

*The ABL Lenders' Position*

The ABL Lenders respond that the Maximum ABL Facility amount did not change in any respect as a result of the Amended ABL Credit Agreement. First, the change in form of $275 million in outstanding revolving loans to outstanding Term Out Revolving Loans did not have any impact on the Maximum ABL Facility Amount. Second, there is no legal basis to exclude the $140 million Effective Date Revolving Commitments from the Maximum ABL Facility Amount. Thus, the ABL lenders submit that payments made from the proceeds of Liquid Collateral were consistent with the priority scheme established in the Intercreditor Agreement.

i) Revolving Loans Refinanced To Term Loans

The Amended ABL Credit Agreement's conversion of revolving loans into Term Out Revolving Loans could not have affected the Maximum ABL Facility Amount because the loans were unambiguously Revolving Loan Commitments that were outstanding at the time of the restructuring, and the Amended ABL Credit

13

Agreement was expressly permitted under the Intercreditor Agreement.

Before and after the execution of the Amended ABL Credit Agreement, the Term Out Revolving Loans remained outstanding Revolving Loan Commitments of the same amount, and therefore could not have affected the Maximum ABL Facility Amount. The Intercreditor Agreement defines Excluded ABL Claims without regard to the form of the loan, because they consist of "the aggregate principal amount of loans [i.e., any loans] and outstanding amount of Letters of Credit made in excess of the Maximum ABL Facility Amount." Intercreditor Agreement at § 1.2. Thus, there could not have been a "permanent reduction" of loan commitments when the commitments remain unchanged, and the amount that was already funded and outstanding remained unchanged as well.

Additionally, the ABL Lenders point out that the relevant definitions in the ABL Credit Agreement could be amended, so long as the Intercreditor Agreement did not require the SCP Lenders' consent. Section 9.1(a) of the Intercreditor Agreement confirms that the definitions incorporated were from the version of the ABL Credit Agreement in effect at the time the Intercreditor Agreement was entered into. Section 9.1(a)(ii) of the Intercreditor Agreement lists only

14

a handful of definitions in the ABL Credit Agreement that could not be

amended without the SCP Lenders' consent.  The definition of

Revolving Loan Commitment is not one of them.  The relevant portions

of Section 9.1(a) of the Intercreditor Agreement, titled *Amendments to*

*Loan Documents*, provide as follows:

> (a) Amendment of ABL Loan Documents. The ABL Secured
> Parties may at any time and from time to time and without
> consent of or notice to any SCP Secured Party, without incurring
> any liability to any SCP Secured Party and without impairing or
> releasing any rights or obligations hereunder or otherwise,
> amend, restate, supplement, modify, substitute, renew or replace
> any or all of the ABL Loan Documents; provided, however, that
> without the consent of the SCP Agent, the ABL Secured Parties
> shall not, before or during an Insolvency Proceeding, amend,
> restate, supplement, modify, waive, substitute, renew or replace
> any or all of the ABL Loan Documents to:
>
>> (i) increase the rates of interest at any level of the pricing
>> grid set forth in the ABL Credit Agreement as in effect on
>> the date hereof . . . .;
>>
>> (ii) change the definition of "Availability", "Maximum
>> Revolving Loan Balance", "Minimum Availability Block",
>> "Revolving Borrowing Base", "SCP Inventory Sale
>> Reserve" or "Springing Block", each as contained in the
>> ABL Credit Agreement or any component definition
>> thereof (including any sub-component of such
>> component), each as set forth in the ABL Credit
>> Agreement, in a manner that would make more credit
>> available to the Borrower . . . .

See Intercreditor Agreement § 9.1(a); see also § 1.2 (defining the ABL

Loan Documents, including the ABL Credit Agreement, as documents

that "may be amended or otherwise modified, supplemented, extended

15

restructured, refinanced or replaced"). The Intercreditor Agreement broadly provides that the ABL Credit Agreement may be amended and restructured (§ 1.2) without the prior consent of the SCP Lenders, and the ABL Lenders thus contend that the conversion of $275 million in Revolving Loan Commitments to Term Out Revolving Loans was permitted under Section 9.1(a).

ii) Illusory Commitments

The ABL Lenders vigorously dispute Salus's contention that the $140 million Effective Date Revolving Commitment was "illusory" or "never intended to be drawn on." Am. Compl. at ¶ 3. First, the ABL Lenders note that nothing in the ABL Credit Agreement or the Intercreditor Agreement supports the allegation that the commitments at issue were illusory. Conditions upon a borrower's right to draw on a revolving facility are not unusual in the least, and the fact that a struggling company such as RadioShack would face restrictions on its access to a lending facility is not remarkable. Even more significant, the ABL Lenders contend that there is no place for inquiry into the ABL Lenders' subjective intent in the exercise of interpreting the commercial contracts at issue in this case. To the extent that such an inquiry is necessary, the ABL Lenders state that there are no facts alleged in the Amended Complaint that would support "an inference of wrongful

intent." See <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 684 (2009) (discussing

pleading requirements relating to claims predicated upon intentional

conduct).

### III. PROCEDURAL HISTORY

On March 17, 2015, Salus commenced this adversary proceeding

and on May 22, 2015, Salus filed the Amended Complaint.  Adv. D.I. 1,

32.  The Amended Complaint alleges the following nine causes of

action:  (I) and (II) declaratory judgment; (III) disgorgement or turnover

of loan repayments; (IV) breach of contract and specific performance;

(V) breach of implied covenant of good faith and fair dealing; (VI)

tortious interference with contract; (VII) unjust enrichment; (VIII)

money had and received; and (IX) conversion.

The ABL Lenders, Litespeed and Cantor Fitzgerald have all filed

separate motions to dismiss the Amended Complaint pursuant to FRCP

12(b)(6) for failure to state a claim upon which relief can be granted.

Adv. D.I. 38, 39, 43.   This matter has been fully briefed[8] and is ripe for

decision.

### IV. JURISDICTION AND VENUE

The Court has jurisdiction over these matters pursuant to 28

U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this Court

---

[8] The parties have waived oral argument on the collected Motions to Dismiss.  <u>See</u>
Adv. D.I. 62.

pursuant to 28 U.S.C. § 1409.  Plaintiff has alleged that this is a core

proceeding under 28 U.S.C. § 157(b)(2)(A), (K) and (O).  <u>See</u> Am.

Compl. at ¶ 11.  The Court has the power to enter an order on this

Motion to Dismiss even if the matter is non-core or it has no authority

to enter a final order.  <u>See, e.g.</u>, <u>In re Nat'l Serv. Indus., Inc.</u>, No. AP 14-

50377 (MFW), 2015 WL 3827003, at *2 (Bankr. D. Del. June 19, 2015)

("Even if the matter is non-core or the Court lacks authority to enter a

final order, however, the Court has the power to enter an order on a

motion to dismiss.") (citations omitted); <u>In re Tropicana Entm't, LLC</u>,

520 B.R. 455, 463 (Bankr. D. Del. 2014) (same).

## V.  STANDARD OF REVIEW

A Rule 12(b)(6) motion aims to test the sufficiency of the factual

allegations in a plaintiff's complaint.  <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>,

550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); <u>Kost v.

Kozakiewicz</u>, 1 F.3d 176, 183 (3d Cir. 1993).  To decide a motion to

dismiss under Rule 12(b)(6), the Court must "accept all well-pleaded

allegations in the complaint as true, and view them in the light most

favorable to the plaintiff."  <u>Carino v. Stefan</u>, 376 F.3d 156, 159 (3d Cir.

2004); <u>see also</u> <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 231 (3d

Cir. 2008) (stating that the Supreme Court has reaffirmed that, on a

Rule 12(b)(6) motion, the facts alleged must be taken as true and a

18

complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits"). In addition, all reasonable inferences are drawn in favor of the plaintiff. Kost, 1 F.3d at 183. Legal conclusions, however, are not entitled to a presumption of truth. Iqbal, 556 U.S. 662. Federal Rule of Civil Procedure 8(a)(2) "requires a 'showing' rather than a blanket assertion of an entitlement to relief . . . [because] without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." Phillips, 515 F.3d at 232 (citing Twombly, 550 U.S. at 556 at n. 3).

While a court's analysis in a Rule 12(b)(6) context is typically limited to the four corners of a complaint, as noted above, a court may consider other documents referenced in a complaint. Here, all of the claims set forth in the Amended Complaint derive from the Intercreditor Agreement and the relevant loan documents. These documents have been included in the record on the Motions to Dismiss, and there is no question as to their authenticity or their centrality to the dispute before the Court. See Moskowitz Decl. at Ex. A, C.

## VI.  DISCUSSION

The claims at issue in this adversary proceeding hinge on the interplay of the Intercreditor Agreement and the Amended ABL Credit Agreement.  The Court is thus obliged to interpret and construe these agreements, a process governed in this instance by New York law.

Applicable case law teaches that the Court's role in contract interpretation is to give effect to the intent of the parties as defined by the provisions of their agreements.  See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000) (citing Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993)). "The secret or subjective intent of the parties is irrelevant to the analysis," Klos v. Poskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997), a point of particular significance in evaluating Salus's claims of "illusory commitments" in the Amended ABL Credit Agreement.

If the provisions of a contact are clear, judicial inquiry is complete.  Accordingly, if the unambiguous terms of the Intercreditor Agreement and the Original ABL Credit Agreement permitted the restructuring while preserving the ABL Lenders' senior lien rights in the Liquid Collateral, then Defendants are entitled to dismissal of the Amended Complaint.  The threshold question is whether the terms of

these agreements are ambiguous. "An agreement is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who examines the entire contracts and knows the customs, practices, usages and terminology generally understood in the particular trade of business." In re Musicland Holding Corp., 374 B.R. 113, 120 (Bankr. S.D.N.Y. 2007) (collecting cases applying New York law).

Salus may recover on its claims only if the obligations in the Amended ABL Credit Agreement were not permitted by, or at least protected under the Intercreditor Agreement. The Court's study of the Intercreditor Agreement, however, reflects that the senior lien rights of the ABL Lenders were not impaired by way of the Amended ABL Credit Agreement.

First, as noted above, Section 9.1 of the Intercreditor Agreement provided relatively broad (and commercially standard) rights to amend "any or all of the ABL Loan Documents," and the narrow restrictions on those rights are not implicated here. At bottom, the Intercreditor Agreement permitted the ABL Lenders to refinance their loans to RadioShack without the prior consent of the SCP Lenders, so long as that refinancing did not encroach on those specific terms that would

directly affect the SCP Lenders' exposure as a subordinated lender to RadioShack.

Second, Salus has failed to demonstrate that its position was unfairly changed, either as a matter of economics or contract law, as a result of the restructuring of the ABL Credit Agreement in October 2014.  The ABL Lenders correctly point out that the obligations upon which the ABL Lenders have been paid were already outstanding as of the time of the amendment in October 2014.  These obligations were thus squarely within the definition of Maximum ABL Facility Amount and cannot be treated as Excluded ABL Claims.  Put more simply, the SCP Lenders held junior rights in the Liquid Collateral behind the claims of the ABL Lenders both before and after the restructuring.  The Intercreditor Agreement does not operate here to vault the SCP Lenders ahead of the ABL Lenders in entitlement to proceeds of the Liquid Collateral.

In conclusion, the unambiguous provisions of the Intercreditor Agreement allowed the ABL Lenders to enter into the Amended ABL Credit Agreement.  The ABL Lenders did not breach the Intercreditor Agreement, and they were not unjustly enriched by the proceeds they received from the disposition of the Liquid Collateral.  Further, the ABL

Lenders neither tortiously interfered with Salus' contractual rights nor converted Salus' collateral.

## VI.  CONCLUSION

For the reasons stated above, the Court finds that the Amended Complaint fails to state a claim upon which relief may be granted.  The Motions to Dismiss are granted, with prejudice, as the Court finds that amendment would be futile in this case.  An appropriate order follows.

**BY THE COURT**:

Dated:  May 11, 2016
Wilmington, Delaware

_____

Brendan Linehan Shannon
Chief United States Bankruptcy Judge

23

## COUNSEL OF RECORD

| | |
|---|---|
| SKADDEN, ARPS, SLATE MEAGHER & FLOM LLP<br>Anthony W. Clark (I.D. No. 2015)<br>Jason Liberi (I.D. No. 4425)<br>One Rodney Square<br>P.O. Box 636<br>Wilmington, DE 19899<br><br>-and-<br><br>Jay M. Goffman<br>Mark A. McDermott<br>Four Times Square<br>New York, NY 10036<br><br>*Counsel for Plaintiff Salus Capital Partners, LLC, as agent, with respect to claims against Defendants Cantor Fitzgerald Securities LLC, BlueCrest Multi Strategy Credit Master Fund Limited, DW Catalyst Master Fund, Ltd., DW Value Master Fund, Ltd., Saba Capital Management, LP, Macquarie Credit Nexus Master Fund Limited, Taconic Opportunity Master Fund, L.P., Taconic Master Fund 1.5 L.P., Mudrick Capital Management LP., and John Does #1-50* | CHOATE, HALL & STEWART LLP<br>John F. Ventola<br>Douglas R. Gooding<br>Sean M. Monahan<br>Two Internationl Place<br>Boston, Massachusetts 02110<br><br>*Counsel for Plaintiff Salus Capital Partners, LLC, as agent, with respect to claims against Defendants Standard Wireless Inc., General Wireless Inc., Standard General L.P., General Retail Holdings L.P., General Retail Funding LLC, Litespeed Master Fund, Ltd., Litespeed Management, L.L.C., and T. Rowe Price Associates, Inc.* |
| BLANK ROME LLP<br>Stanley B. Tarr (No. 5535)<br>Victoria Guilfoyle (No. 5183)<br>1201 N. Market Street, Suite 800<br>Wilmington, DE 19801<br><br>-and-<br><br>Lawrence F. Flick, II, Esquire<br>Rick Antonoff, Esquire<br>Michael Kim, Esquire<br>The Chrysler Building<br>405 Lexington Avenue<br>New York, NY 10174-0208 | MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>Robert J. Dehney (No. 3578)<br>Gregory W. Werkheiser (No. 3553)<br>Matthew B. Harvey (No. 5186)<br>1201 N. Market Street, 16th Floor<br>Wilmington, DE 19801<br><br>-and-<br><br>DLA PIPER LLP (US)<br>Greg Galardi, Esquire<br>Kevin D. Finger, Esquire<br>1251 Avenue of the Americas<br>New York, NY 10020 |

24

| | |
|---|---|
| -and-<br><br>DAVIS POLK & WARDELL LLP<br>Damien S. Schaible, Esquire<br>Elliott Moskowitz, Esquire<br>Justin Sommers, Esquire<br>Darren S. Klein, Esquire<br>450 Lexington Avenue<br>New York, NY  10017<br><br>*Counsel to BlueCredit Capital Management (New York) LP; DW Partners, L.P.; Macquarie Credit Investment Management Inc., Mudrick Capital Management, LP; Saba Capital Management, L.P.; T. Rowe Price Associates, Inc. and Taconic Capital Advisors L.P.* | *Counsel to General Wireless Inc., Standard General L.P., General Retail Holdings L.P. and General Retail Funding LLC* |
| POTTER ANDERSON & CORROON LLP<br>Jeremy W. Ryan (No. 4057)<br>Etta R. Mayers (No. 4164)<br>R. Stephen McNeill (No. 5210)<br>1313 N. Market Street, Sixth Floor<br>P.O. Box 951<br>Wilmington, DE  19899<br><br>-and-<br><br>KAYE SCHOLER LLP<br>Scott D. Talmadge, Esquire<br>H. Stephen Castro, Eesquire<br>Jeffrey A. Fuisz, Esquire<br>Jonthan M. Agudelo, Esquire<br>250 West 55th Street<br>New York, NY  10019<br><br>*Counsel to Cantor Fitzgerald Securities, as administrative agent under the Amended ABL Credit Agreement and the successor-in-interest to General Electric Capital Corporation under the Original ABL Credit Agreement* | YOUNG CONAWAY STARGATT & TAYLOR LLP<br>C. Barr Flinn (No. 4092)<br>Kenneth J. Enos (No. 4544)<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE  19801<br><br>-and-<br><br>GOODWIN PROCTOR LLP<br>Brian D. Hail, Esquire<br>The New York Times Building<br>620 Eighth Avenue<br>New York, NY  10018<br><br>*Counsel to Litespeed Management L.L.C. and Litespeed Master Fund, Ltd and Affiliates* |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**RADIOSHACK CORPORATION, et al.,**[9]<br><br>       Debtors. | Chapter 11<br><br>Case No. 15-10197 (BLS)<br><br>Jointly Administered |
| Salus Capital Partners, LLC, in its capacity as Agent,<br><br>       Plaintiff,<br><br>V.<br><br>Standard Wireless Inc.; General Wireless Inc.; Standard General L.P.; General Retail Holdings L.P.; General Retail Funding LLC; Litespeed Master Fund, Ltd.; Litespeed Management, L.L.C.; Cantor Fitzgerald Securities LLC; Bluecrest Multi Strategy Credit Master Fund Limited; DW Catalyst Master Fund, Ltd.; DW Value Master Fund, Ltd.; Saba Capital Management, LL; Macquarie Credit Nexus Master Fund Limited; Taconic Opportunity Master Fund L.P.; Taconic Master Fund 1.5 L.P.; T. Rowe Price Associates, Inc.; Mudrick Capital Management, LP.; And Jon Does #1-50,<br><br>       Defendants. | Adv. No. 15-50239 (BLS) |

---

[9] The Debtors include the following entities:  RadioShack Corporation; Atlantic Retail Ventures, Inc.; Ignition L.P.; ITC Services, Inc.; Merchandising Support Services, Inc.; RadioShack Customer Service LLC; RadioShack Global Sourcing Corporation; RadioShack Global Sourcing Limited Partnership; RadioShack Global Sourcing, Inc.; RS Ig Holdings Incorporated; RSIgnite, LLC; SCK, Inc.; Tandy Finance Corporation; Tandy Holdings, Inc.; Tandy International Corporation; TE Electronics LP; Trade and Save LLC; and TRS Quality, Inc.

# <u>ORDER</u>

Upon consideration of the Motions to Dismiss filed by Litespeed [Adv. D.I. 38], the ABL Lenders [Adv. D.I. 39], Cantor Fitzgerald [Adv. D.I. 43] (the "Motions to Dismiss") seeking an order dismissing the Complaint that commenced the above-captioned adversary proceeding pursuant to Rule 12 of the Federal Rules of Civil Procedure; and the related pleadings [Adv. D.I. 53, 57, 58, 59]; and for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED,** that Motions to Dismiss are **GRANTED** and this action is dismissed with prejudice for the reasons stated in the accompanying Opinion.

**BY THE COURT**:

Dated: May 11, 2016
Wilmington, Delaware

Brendan Linehan Shannon
Chief United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : |
| | :   Chapter 11 |
| RS LEGACY CORPORATION, *et al.*, | : |
| | :   Case No. 15-10197 (BLS) |
| Debtors.[1] | : |
| | :   (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Salus Capital Partners, LLC, in its capacity as Agent, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| Standard Wireless Inc.; General Wireless Inc.; Standard | :   Adv. Proc. No. 15-50239 |
| General L.P.; General Retail Holdings L.P.; General | : |
| Retail Funding LLC; Litespeed Master Fund, Ltd.; | : |
| Litespeed Management, L.L.C.; Cantor Fitzgerald | : |
| Securities LLC; BlueCrest Multi Strategy Credit Master | : |
| Fund Limited; DW Catalyst Master Fund, Ltd.; DW | : |
| Value Master Fund, Ltd.; Saba Capital Management, LP; | : |
| Macquarie Credit Nexus Master Fund Limited; Taconic | : |
| Opportunity Master Fund L.P.; Taconic Master Fund 1.5 | : |
| L.P.; T. Rowe Price Associates, Inc.; Mudrick Capital | : |
| Management, LP.; and John Does #1-50, | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's taxpayer identification number, are RS Legacy Corporation (f/k/a/ RadioShack Corporation) (7710); Atlantic Retail Ventures, Inc. (6816); Ignition L.P. (3231); ITC Services, Inc. (1930); Merchandising Support Services, Inc. (4887); RS Legacy Customer Service LLC (f/k/a RadioShack Customer Service LLC) (8866); RS Legacy Global Sourcing Corporation (f/k/a RadioShack Global Sourcing Corporation) (0233); RS Legacy Global Sourcing Limited Partnership (f/k/a RadioShack Global Sourcing Limited Partnership) (8723); RS Legacy Global Sourcing, Inc. (f/k/a RadioShack Global Sourcing, Inc.) (3960); RS Ig Holdings Incorporated (8924); RSIgnite, LLC (0543); SCK, INc. (9220); RS Legacy Finance Corporation (f/k/a Tandy Finance Corporation) (5470); RS Legacy Holdings, Inc. (f/k/a Tandy Holdings Inc.) (1789); RS Legacy International Corporation (f/k/a Tandy International Corporation) (9940); TE Electronics LP (9965); Trade and Save LLC (3850); and TRS Quality, Inc. (5417). The address of each of the Debtors is 300 RadioShack Circle, Fort Worth, Texas 76102.

## CERTIFICATE OF SERVICE

I, Anthony W. Clark, hereby certify that on May 24, 2016, I caused the foregoing

*Notice of Appeal* to be served, pursuant to Local Bankruptcy Rule 8003-1, on the following

counsel to the Unsecured Creditors Committee by first-class U.S. Mail or in the manner

indicated:

| | |
|---|---|
| Kendra K. Bader, Esq.<br>Kara E. Casteel, Esq.<br>Alex Govze, Esq.<br>Joseph L. Steinfeld, Jr., Esq.<br>Gary D. Underdahl, Esq.<br>ASK LLP<br>2600 Eagan Woods Dr<br>Suite 400<br>St. Paul, MN 55121 | Brigette G. McGrath, Esq.<br>Edward E. Neiger, Esq.<br>Marianna Udem, Esq.<br>ASK LLP<br>151 W. 46th Street<br>4th Floor<br>New York, NY 10036 |
| Jeffrey Lawrence Cohen, Esq.<br>Cathy Hershcopf, Esq.<br>Jay R. Indyke, Esq.<br>Richard S. Kanowitz, Esq.<br>Michael Klein, Esq.<br>Seth Van Aalten, Esq.<br>COOLEY LLP<br>The Grace Building<br>1114 Avenue of the Americas<br>New York, NY 10036 | Benjamin Finestone, Esq.<br>Daniel S. Holzman, Esq.<br>Susheel Kirpalani, Esq.<br>Robert S. Loigman, Esq.<br>William Pugh, Esq.<br>Kate Scherling, Esq.<br>QUINN EMANUEL URQUHART<br>    & SULLIVAN, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010 |
| L. Katherine Good, Esq.<br>Chantelle D'nae McClamb, Esq.<br>Christopher M. Samis, Esq.<br>WHITEFORD TAYLOR & PRESTON LLC<br>The Renaissance Centre<br>405 N. King Street, Suite 500<br>Wilmington, DE 19801 | James C. Tecce<br>MILBANK, TWEED, HADLEY<br>    & MCCLOY LLP<br>1 Chase Manhattan Plaza<br>28 Liberty Street<br>New York, NY 10005 |

*/s/ Anthony W. Clark*
Anthony W. Clark